## Marshall vs. Green Exr.

So far as the answer of the defendants is responsive to the bill, replying to it in the negative and positively, and not admitting it and seeking to avoid the effect of the allegations and admissions by counter allegations, it is the *testimony* of the defendants in their own behalf, and must prevail unless overweighed by other testimony.

Two witnesses, or one whose testimony is well corroborated by circumstances, are necessary to overweigh the direct testimony of a respondent so given.

At the same time the answer is no more sacred than the testimony of a disinterested witness.

And its credit may be wholly destroyed by equivocations, evasions, concealments evident on its face, contradictions, improbabilities, or any other of the many defects and vices in evidence which often make the most positive statement of a witness weigh little or nothing.

Green's executor having filed a cross-bill to subject certain lands to execution at law, the defendants being father and son, answered that after the bond for title had been made, whereby the father acquired a right to the land, he made a transfer of the bond and delivery of possession of the land to the son: *Held,* that this was matter in avoidance which the defendants must prove.

The father having denied that he purchased the land for himself, states in his answer that " he may or may not have told his vendor that he was purchasing for himself;" this being in regard to a matter within his own knowledge, and not being a denial, is in law equivalent to an admission that he did so state.

The answer of one of the defendants being evidently untrue as to a certain statement of a fact within his own knowledge; the maxim *falsus in uno falsus in omnibus* applies, and his testimony ceases to be entitled to any credit whatever.

The defendant must take the privilege of being a witness for himself *cum onere,* subject to all the rules and principles of the law of evidence by which the law strives to guard against the dangers of perjury.

He must be careful to testify fairly, frankly, ingenuously, fully, and it is the duty of his solicitor to see that he does it.

A claim against the estate of a deceased person cannot be verified by the affidavit of an agent.

Execution having been levied on certain lands as the property of the defendant in the judgment at law, the son of the defendant filed a bill in chancery to injoin the sale, claiming the lands as his own, asserting that they had been conveyed to him by his father. Many circumstances combining to show that this alleged conveyance was merely colorable and intended to hinder and delay the creditors of the father, the same is held to be void.

The creditor having filed a cross-bill to subject the lands to the payment of his debt, the court below, in decreeing the sale from the father to the son to be fraudulent and void, should have further decreed that unless by a day fixed, the defendants in the cross-bill should pay the plaintiff the amount of the debt, damages, interest and costs adjudged at law, and also costs on the original and cross-bill, the lands, or so much thereof as as should be necessary, should be sold by a commissioner.

The proceeds of such sale should first be applied to payment of the costs on the original and cross bill and the expense of executing the decree, and the residue should be applied to the payment of the judgments at law, and the surplus, if any, should be brought into court.

Should the proceeds of such sale fail to produce satisfaction of the costs and

judgments at law, the creditor should be remitted to his proceedings at law for the collection of the residue by execution or garnishment.

Damages on the dissolution of an injunction can only be awarded by the court where money is injoined, and then "on the amount released by the injunction."

The suit on the original bill in the case not being to enjoin the collection of a debt generally, but only to prevent the sale of particular property for payment of it, damages should not have been awarded by the court below on dissolving the injunction.

And the court below having erred in this respect to the injury of the appellant, the appellee must pay all the costs accruing in this court, although in other respects the decree entered in this court be in his favor.

*Appeal from Hempstead Circuit Court.*

Hon. Len B. Green, Circuit Judge.

Watkins and Eakin, for the appellant.

S. H. Hempstead, for the appellee.

*Opinion prepared by* A. Pike, Esq.—See *note* page viii.

This suit comes before us upon a cross-bill for discovery and relief, brought to subject certain lands, as the property of William Marshall, the legal title to which is in James A. Marshall, to the payment of two judgments against the former, executions on which judgments had been levied on the lands, and the lien of the judgments is claimed to have fastened upon them in equity.

The chancellor decided the cause, and granted the relief, on what was virtually an issue of fact, as to the real ownership of the lands; and it is for us to decide whether that finding is so plainly against the evidence furnished by the answers and testimony, as to require us to find otherwise, and to reverse the decree.

To determine this, it is first necessary to ascertain what facts in the case are admitted, or so fully proven as to be beyond dispute.

On the 26th of April, 1858, William Marshall the father, a

man about 57 years of age, agreed with B. F. Renfro to purchase from him a small piece of land in Hempstead county, near the town of Washington, containing about two acres or a little less for $203.25; executed his note for this sum and received a bond by which Renfro agreed to convey him the land, on payment of the purchase money.

William Marshall immediately took possession of the land, and continued in actual possession and occupancy of it, from that time forward, until decree rendered in the court below.

Some two months after the first purchase, William Marshall also contracted orally with Renfro for a piece of land 80 feet square, near the other, at the rate of $175 per acre. This sale was evidenced by no writing, nor was the price secured by any; but the purchaser took possession, and ever after retained possession.

Soon after purchasing, William Marshall moved upon the land, and proceeded to build a dwelling house upon it, which, as soon as it became habitable, he occupied and lived in until decree below.

William Marshall was, by trade, a wagon-maker, and had carried on that business in Washington for several years prior to 1858. Both before and after the beginning of that year, his son James A. Marshall, was in the habit of having and collecting accounts for work done by his father.

William Marshall, Renfro testifies, had settled with him, previous to the 8th of March, 1859, the whole purchase money for both pieces of land, except some $17 or $18. Thirty-one dollars were settled by an account, at first made out in the name of William Marshall, but changed, when taken back for correction of items, into the name of James A. Marshall, for work on wagons and ploughs, done by William Marshall, at his shop in 1858, commencing with the 1st of February and without later date of month or day. Eighty-three dollars were settled by transfer of an account against W. A. Muldrow, in favor of James A. Marshall, for the same kind of work, done by William Marshall, in January, February and April,

two items only being later than February, and these amounting to $8.75 only. This account was verified by the affidavit of William Marshall, on the 11th of February, 1859.

The amount of this account was included in a receipt, dated January 1, 1859, given by Renfro to James A. Marshall, when William Marshall handed him the accounts, for an order on George Muldrow for $109.75, due by the estate of Warren Muldrow, and $79.75 due by George Muldrow. Both were for work done by William Marshall.

Previous to March, 1859, William Marshall several times told Renfro that when he should fully have paid for the land, he meant to have it conveyed to his daughter.

The lumber for building the house was purchased in the name of James A. Marshall, as far as purchases are proven. Part was purchased from Collins, to be delivered at William Marshall's building. William Marshall left the bill, and the account for the lumber was made out against him, but James A. Marshall afterwards told Collins *he* would settle the bill, and directed it should be made out against himself. Part of this bill was paid for by shop-work done by William Marshall. Collins had also furnished other lumber, which was delivered on a lot sold by J. A. Marshall to J. R. Eakin, and for the price of this lumber, in part, Eakin gave J. A. Marshall his note, which was given Collins by J. A. Marshall in part payment for the two bills of lumber. Part of the bill for the lumber for the house was also settled by a grocery bill due by Collins to J. A. Marshall & Brother. Another lot of lumber was bought from Matthew Moss, William Marshall bringing the bill for it, but it being in James A. Marshall's name. James A. told Moss *he* had sent the bill, and would see it paid and he gave his note for it. William Marshall said it was to build a house on land he had bought from Renfro.

On the 7th of March, 1859, William D. Green, as executor of the will of George W. Green, filed in the office of the clerk of the circuit court of Hempstead county a transcript of a judgment obtained by him against William Marshall before a justice

of the peace, on the 13th of December, 1858, for $88.33 debt, and $60.88 damages, with costs, and interest at 10 per cent. on debt and damages.

And on the 11th April, 1859, he filed a transcript of another judgment before a justice of the peace, also obtained by him against William Marshall, on the 3d of January, 1853, for $66.09 debt, $13.20 damages and 87 cents costs, with interest at 10 per cent. on debt and damages.

On the 8th of March, 1859, the day after the first transcript was filed, William Marshall, by indorsement under seal, on the bond for title, assigned it, and all his rights and equities therein, to James A. Marshall, and directed deed to be made to him; this being stated by the indorsement to be due for value received, and in pursuance of a previous agreement between the father and son, by which, in consideration that the son would pay the notes for which the bond was given, he was to acquire all the father's right, title and interest in and to the land. James A. Marshall then told Renfro, on applying to him the same day for a deed, that the indorsement had been very carefully drawn, because he expected to have to fight Green for the land, and that, if it was not fully paid for, he would pay the balance still due; and he did give his note for the $17 or $18 unpaid, and Renfro made him a deed of conveyance.

Executions issued from the clerk's office on the two judgments, against William Marshall, returnable to May term, 1859, and were levied on the lands, and these advertised to be sold on the 30th of May.

To prevent this sale, James A. Marshall, on the 30th of May, filed his bill against Green as executor, the sheriff and William Marshall, claiming the land as his, and seeking to injoin the sale. The injunction was granted. At November term 1859, Green answered, and exhibited cross-bill to subject the lands to his executions, as the property of William Marshall, making the father and son defendants. Each answered; and the cases being duly at issue were heard together.

So far as the answers of the Marshalls are responsive to the allegations of the bill, replying to them in the negative and positively, and not admitting them and seeking to avoid the effect of the allegations and admissions by counter-allegations, they are the *testimony* of these defendants, in their own behalf, and must prevail, unless over-weighed by other testimony. Two witnesses, or one whose testimony is well corroborated by circumstances, are necessary to overweigh the direct testimony of a respondent so given. At the same time, the testimony of a respondent, in the shape of an answer is no more sacred than that of a disinterested witness; and its credit may be wholly destroyed by equivocations, evasions, concealments evident on its face, contradictions, improbabilities, repugnance to facts impossible to be denied, or any other of the many defects and vices in evidence, which often make the most positive statements of witnesses weigh little or nothing.

The principal allegations by which the son's title is impeached are:

1st. That the father bought the land for his own use and benefit.

This the son virtually admits, by not denying it, and by admitting that he did *not* at first purchase it for the use of and on behalf of him, the son. His account is, that, about the 1st of May, 1858, (four days after the purchase) before the bond had been proven, acknowledged or recorded, or any thing done to carry it into execution, the father, finding himself in embarrassed circumstances and professing to be unable to conclude his bargain with Renfro, agreed with the son to transfer to him his interest in the contract, if he would pay the purchase money; which proposition the son accepted, and the father delivered him the bond and put him in possession.

But the father swears that he *originally* made the purchase on account of his son, the land to be paid for out of the son's means, and to be conveyed to him for his own use. He says that he may or may not have *said*, at the time of the purchase, that he was purchasing for his own use; a matter of more importance and

significance than he seems to imagine it, but he avers that the bond for title was made *hastily* and *carelessly* to himself, instead of to James A. Marshall, *for whom he intended the purchase*, and to whom he afterwards transferred the bond and delivered possession. And he broadly avers that he never meant to buy for himself, and never paid a cent for the land out of his own means, and that he had never set up any claim to it, since the verbal transfer to his son.

This matter of a verbal transfer and assignment of the contract and bond, being set up affirmatively, to avoid the legal conse-quences flowing from the facts that the father purchased the land, the son in no way intervening, and that he gave his note for the price, and took a bond for title to himself, which note and bond for title were still in existence uncanceled as late as the 8th of of March, 1859, more than ten months afterwards, is still matter in avoidance, pleaded affirmatively, and put in issue by the repli-cation. The only proof that it was ever made is furnished by another son of William Marshall, who states that he had heard his father say, two or three times, the first time about two years prior to November, 1860, that he had transferred the land to James A. Marshall. It is very certain that if the son had filed a bill against the father for specific performance of this verbal contract, this testimony would not have entitled him to relief; nor would any degree or quantity of parol evidence as to the making of the bargain have done it, because there would have been no sufficient proof of part performance to take the case out of the operation of the statute of frauds, as we shall hereafter more clearly see.

The testimony of William J. Marshall amounts to but little, on this point, not only because the father himself paid, with accounts for work done by him, nearly the whole purchase money, repeatedly told Renfro that when he should have finished paying for it, he would wish it conveyed to his daughter; but also because the account of the purchase given by the father himself, in his answer, carries its own contradiction upon its face. He evades

28

answering that he did tell Renfro he was purchasing for himself, by saying that he may or may not have said so, when it is entirely improbable that, when giving his own note for the price and taking a bond to himself, he did not say something equivalent to a statement that he was buying for himself. The answer, couched in these disingenuous words, is equivalent to an admission that he did *not* give Renfro to understand that he was *not* purchasing for himself, but for his son. And the answer that he may or may not have said so and so, not being a denial, and this of a matter certainly within his own knowledge, is in law, as it is in reason, equivalent to an admission that he did so state.

The averment that the bond was "hastily and carelessly" taken to himself, is worse than an evasion. Did he also "hastily and carelessly" execute his own note for the price? It is inconceivable how any man could expect to blind a chancellor or avoid the legal conclusions resulting from the deliberate execution of the most solemn and binding instruments, by such a transparently absurd averment. If the chancellor was satisfied that this deliberate allegation was false, he could not but conclude that the positive and reiterated averment that he purchased, not for himself, but for James A. Marshall, was also willfully and deliberately false. We cannot but think he was justified in so concluding; and then, as the whole weight of William Marshall's answer as testimony depends upon his credit as a witness, the maxim "*falsus in uno, falsus in omnibus*" applies, both in law and reason, and his testimony ceases to be entitled to any credit whatever.

Fraud always takes a tortuous course, and endeavors to cover and conceal its tracks. The defendant to a bill which seeks to unearth and expose it, has a mighty advantage in being allowed to swear in his own behalf. He must take the privilege of being a witness for himself *cum onere*, subject to all the rules and principles of the law of evidence, by which the law strives to guard against the dangers of perjury. He must be careful to testify fairly, ingenuously, fully. It is the duty of his solicitor to see that he does it, though, as every one knows who has been familiar

with the chancery practice in this state and elsewhere, such is not the universal idea of the solicitor's duty; and answers too often display ingenuity in evasion, and reluctance to admit the whole truth rather than fairness and frankness; a fault so general as to seem almost to have ceased to be a fault at all.

Moreover, the two accounts, given by the father and the son in their answers, are irreconcilable and both improbable. If, as the father alleges, he purchased for the son, how could the son *truly* answer, that " he does not know, and has not been informed, save by said cross-bill, and cannot set forth as to his information or belief or otherwise, whether or not the said William purchased the said tract of land for his own use or otherwise." That is not credible, if the father's answer is true. Both pretend that the son has been virtually the guardian of the father for years, the latter being unable to support himself, without the help of the former; and the former hiring him to work for him and collecting his accounts. Is it at all credible that the father would have purchased land for the son without authority from him, without notice to him, without letting him know he was about to do so, or had done so? Can it be true that the son had, when he answered, no *information* or *belief* on that point? It is too evident that this is one of those too common tricks of evasion in answering, or rather in testifying under oath, which *are* common, because they have not been visited with the consequences which they demand. It is far too common for respondents to answer that they have no knowledge, information or belief on a given point; this being done for the purpose of putting the complainant to trouble, when they *do* possess sufficient information, and their belief and conviction are sufficient and sufficiently well founded to make it their sworn duty to admit the fact alleged. A defendant is as much bound to answer as to his information, hearsay and belief, as to his knowledge. What *he* believes, the court will believe, if it is against his interest. Fair and frank answers will be much more common than they are now, when parties cease to swear falsely by such denials, and when the tes-

timony of which these make part, is held to be wholly discredited by them, and chancellors shall pronounce them entitled to no weight or consideration. A defendant should be the more scrupulously frank and fair, because his interest exposes him to suspicion.

Not only when an answer which is to be the defendant's testimony in his own behalf, contains a deliberate, positive and willful mis-statement of fact; but equally when it is manifestly reticent, evasive, or disingenuous, the chancellor not only *may* act on the maxim "*falsus in uno, falsus in omnibus*," and attach little or no credit to the whole; but he *ought* to do so, as a jury should, where a witness before them, testifying orally, deliberately perjures himself as to a single fact, or reluctantly lets the truth ooze out, or attempts to evade or avoid full disclosure, or testifies unfairly and disingenuously, or contradicts himself, or is contradicted by circumstances that cannot lie.

When it was demanded of the chancellor that he should believe the statement of James A. Marshall, that four days after his father purchased the land, he concluded he could not carry out the bargain, and *therefore* assigned the contract and bond for title, by parol, to his son, it devolved upon him to compare this testimony of the claimant under the alleged parol transfer, with all the facts and circumstances in proof, and determine whether he could give it credit or not. In doing so, he could not fail to be startled by the singular reply of the son as to his knowledge, information and belief in respect to his father's purchasing or not purchasing for himself. It was singular that the father should become convinced of his inability to pay for the land only four days after he bought it; and when he could and did pay for it, and for another piece of land purchased two months afterwards, with accounts for work done by him, which were due at the time of the purchase. It was singular, if the father so soon concluded that he could not pay for the land, that he should, two months afterwards, two months after abandoning the contract to his son, go on to purchase from the same person an adjoining piece of land. It was

singular that the son did not at once substitute his note in place of his father's, and himself pay for the land with those accounts which he claimed as his own property. It was singular he should take no assignment of the title bond for ten months, and not until one of the transcripts on which execution issued had been filed in the clerk's office. All these circumstances were materials for the chancellor's judgment, affecting the credibility of the whole answer of the son.

2d. That upon the purchase from Renfro, the father took possession of the land, and proceeded to improve it and to build a dwelling-house upon it: that he contracted for the lumber and materials in his own name, erected the building in his own name, and for his own use, his son having a family of his own and living elsewhere, and following a different business; that the father employed hands to work on the house, and paid them in his own labor, or with his own money: that the son took no control over the building, ordered no materials, and paid nothing towards the expense of building or improvement, until about the 8th of March, 1859; that he hired no hands to work on it, and became responsible for nothing connected with it, until about the same time; and that the father continued all the time in possession, the son never claiming to be proprietor in any public or open manner until about the same time; and that if the son made any payments on account of the house, he made them out of moneys earned by the father at his trade, collected by the son on settlement, and to be applied for the father's benefit as he should direct; the son having, for some years, been in the habit of collecting his father's accounts.

The reply to this is: that the father did take and retain actual possession and occupancy of the land, and lived on it until the suit was brought, his son having a family of his own and living elsewhere; but—that he was in reality, in consequence of the verbal transfer of the contract and bond, only the son's tenant at will or sufferance; that the house *was* intended for the residence of the father: but he did not do any work or procure it to be done,

or contract for any lumber or materials, in his own name, or otherwise than as agent for the son and on the son's responsibility; that the son exercised full control, assumed all the responsibility and bore all the expenses of improvements, after the verbal transfer, the father improving entirely under his control and direction. It is not pretended that the father paid any rent for the land. It is admitted that nothing was paid him, or agreed to be paid as a consideration for his transfer of the title. It is not disclosed, as was afterwards proven, that the purchase-money had been nearly paid by old accounts for work done by the father. It is not alleged that the son planned the building, or superintended the work, or hired any hands to work on it, or in any way interfered.

It is further replied, that the purchase money of the land and the materials of the house were in part paid and settled with accounts for work done by the father; and that before the purchase the son had been in the habit of collecting accounts due his father; but this was because the father was embarrassed, and the son furnished him supplies and money, and took the accounts in part payment for the same; and that since January, 1853, the son owned all the accounts, and the father only collected them, when he did so at all, as his employee; and that the son paid Renfro with money and assets of his own—because he had fully settled with the father for all the proceeds of his work and labor that had come to his hands; and the son sometimes used the father as his agent, in the transaction of business, and employed him as a mechanic to work on the house. And to prove that the son did not pay for the land or buy materials with means derived from the labor of the father—"except such as belonged to the son under contract," it is pleaded that on the 3d of March, 1858, the son agreed with the father that he would pay him $500 for his work and the proceeds of it that year, he, the son, controlling the business, furnishing the materials and receiving the proceeds: an arrangement which has continued every year afterwards; that Renfro was paid in part by work done by the father while in the son's employ: how much, is not stated.

This agreement is found with the testimony of William J. Marshall, another son. It was executed by each party under his seal; and the witness proves the signatures genuine; and that he saw and read it in the early part of the year 1858, when it was placed by James A. Marshall in the safe at the grocery, for safe-keeping, where it remained twelve months or more. There is no proof that this arrangement was made public. The witness had heard his father say, he was working for James A. Marshall, several times since the agreement was made; heard him say so soon after it was made, and since it was made James A. has exercised the right to control and collect all the accounts for work done by the father. The instrument fixes the compensation of the father at *four* hundred dollars. The answers say it was *five* hundred: and William J. Marshall says that both parties told him it was *five* hundred. If the arrangement was a real and *bona fide* one, made by a poor man unable to support his family by his work, this indifference—as to the amount of compensation he was to receive—might well have seemed singular to the chancellor.

So this witness says that, about two years or over before he testified (which he did in November, 1860,) he heard his father say he had transferred to James A. the lands bought of Renfro; and that "since then James A. Marshall has exercised control and ownership over that property" and had the improvements made on it, though the father occupied it and worked on the house. Never heard him claim it as his own: he said it was James A. Marshall's. This was before the 7th of March, 1859. He proves that James A. had furnished some lumber for the shop and paid for some hauling, since the spring of 1858: and that he exercised acts of ownership over the property by furnishing materials, paying money etc. How much he paid, the witness could not say; but swears he furnished all the lumber and paid out a great deal: but how much lumber he furnished he does not know.

If there was really this distinct arrangement, made in earnest and in good faith, it is hard to conceive why the account against Renfro should first have been made out in the name of William

Marshall as creditor, and then changed to that of James A. Marshall. And also it should be noted that the claim against Muldrow's estate, for work done by William Marshall, was verified by *his* affidavit, though that of the creditor himself was required by law, and a claim could not be verified by the affidavit of an agent, as this court had decided six years before.

That it was not made publicly known that the son was building the house, the father being only his agent, is proven by Renfro, who understood from the father's own statements as to the plan that he himself was directing it, and that he was controlled in regard to the plan by the consideration of expense. It is plain the arrangement was a secret one.

The agreement between the father and the son set up in the answers, under which it is claimed the father worked at his trade, is affirmative matter, to avoid the effect of the admission that the accounts of William Marshall for work, were used by him to pay Renfro for the land, and by James A. Marshall to pay for materials for the house. Such an agreement is produced and proven by a witness. It was a secret agreement, not known to the public: and whether it was made in good faith, and as evidence of a real and actual business arrangement, or only as a device to hinder creditors, was a question for the chancellor to decide upon all the circumstances.

3d. That upon a fair accounting, a large balance would be found due from the son to the father, charging the former with all moneys collected for the latter, and crediting him with all advances and payments:—and by special interrogatories the son was required to state how much he had collected, in all, from persons who owed his father : how much his father ever owed him ; and how much more he had paid for his father than he had received; and as to that the cross-bill prayed for an account to be taken.

The son declined to account: but stated that his father was largely indebted to him at the time of the verbal transfer of the contract for the land, then owing him *about* $381.91; and that he continued largely indebted, owing him about the same *when*

*James A. Marshall paid Renfro for the lands:* and at the time of answering about $736.12. This accuracy as to the dollars and cents would seem to indicate that the materials for a full account existed, and that the account had been kept and the balance due at different times ascertained; but no account is furnished or statement of items of advances made or of accounts collected.

The general charges, that the transfer of title was made to prevent creditors of the father from collecting their debts; and that the other arrangements and dealings were made and had with the fraudulent design of securing his earnings to the father and shielding his property from his creditors, are broadly and positively denied by both answers.

The son submitted that it is no fraud upon creditors to assist, by advances of money and supplies, a parent whose advancing age and indigent circumstances render him unable to support himself; and to take in part remuneration such choses in action or other effects as the father may be able to transfer; or to step in and relieve him of a bargain which he is unable to carry out: or to furnish him with a house for his shelter and protection. And this is earnestly and eloquently urged upon us by his counsel as presenting the true features of his case.

If such and such only *were* the purposes and motives of the son, it probably seemed to the chancellor, as it certainly seems to us, that they could have been attained in a more natural and straight-forward way. If the proceeds of the father's labor were insufficient to support him as his family, and the son was willing and intended to loan or present him with such amounts, in money or supplies, as the proceeds of his labor fell short of furnishing, it was easy to do so without interfering with his business, or hiring his time and labor. The means used were more than was necessary to attain the object, and persuasively suggest a further object and purpose, the one assigned not being adequate to account for the resort of the parties to these means. Did the necessity of contributing to the father's support require that the son should demand to be repaid for his advances, as far as the father could

repay him, not in moneys collected by the father from those who became indebted to him, but in the accounts themselves: that the son should take the trouble of collecting those accounts; that he should himself carry on the father's business, pay him an annual stipend, and be entitled to all the proceeds of his labor? That course would naturally engender suspicion that the object was not alone to contribute to the father's support by the addition of gratuities to his earnings, but also to place those earnings beyond the reach of his creditors. If such was not one and perhaps the chief object, what necessity is pleaded or shown for so taking control of the father's labor and business, and collecting the accounts for his work? Such secret arrangements between father and son, being unusual, are naturally suspicious, and could be freed from suspicion only by being publicly avowed and made known.

So, too, if the son desired merely to give his father a home, the way to do so legally and fairly was easy. A purchase of the land by the son himself, and a lease for years, or conveyance for life, in trust, duly placed on record, would have been a plain and straight-forward mode of effecting what was desired. But fraud does not move on straight lines, but seeks circuitous and secret paths to effect its purposes, and by these betrays itself. If the son had taken the simple and natural measures to effect the ends which he professes he had alone in view, we could have believed that he had no other, and that he was actuated by no other motives than those which he professes. The only key to explain the devices to which he resorted, is supplied by the facts that his father had long been in embarrassed circumstances, and that the land and house were in danger of being subjected to payment of the complainant's judgments. And if the purpose of the son really was not to put his father's earnings beyond the reach of his creditors, and to enable him in reality to own and to enjoy the land purchased, laughing at the attempts of his creditors to subject it to the payment of his debts, it is exceedingly unfortunate that the course of action pursued and the plans resorted to, were

such as fraud, seeking to hinder and defeat the claims of creditors, would have availed itself of, as most appropriate and efficient.

In *Hildreth vs. Sands*, 2 *J. C. R.*, 35, the debtor had continued in possession, and in the exercise of acts of ownership. He superintended the erection of a building on the premises, and made improvements on them at his own expense, and received the rents. The party claiming against the creditors, alleged in his answer, that the debtor so in possession acted all the time. as his agent; but the chancellor said, " there is no certain authority produced from which that agency flowed, nor any voucher or account exhibited as evidence of the agency, nor even any assumption of that character, prior to the autumn of 1810, when C. Sands first represented himself as acting in that capacity. These continued acts of ownership are inconsistent with the averment of a fair, bona fide sale of the property in February, 1807, and inconsistent with the ordinary course of dealing, when no imposition is intended to be practiced upon mankind." And he referred to *Codwise et al., vs. Sands*, 4 *Johns.*, 536, where it was held in the court of errors, " that the receiving of rents and managing the estate by the vendor, after an alleged sale, and under an assumed agency from the vendee, but without any evidence of a genuine agency, other than the uncorroborated assertion of the party, was a strong indication of fraud." Nothing, he said, would be more destructive to fair dealing and to the rights of others, than to permit such a miserable contrivance to prevail: for all fraudulent sales could be masked in this way with the utmost facility. "Whether such a fraudulent conveyance," he said, "shall stand or fall, is a question deeply interesting to the whole community."

In the court of errors, 14 *John.*, 493, upon an opinion delivered by SPENCER, J., this decree was unanimously affirmed. The question was, whether a deed executed in February, 1807, was to be deemed fraudulent. The party seeking to avoid it was purchaser of the property under a judgment obtained in February, 1808; but it was proved that Sands was under considerable embarassments in 1807, and Judge SPENCER said that the court had a right

to infer that the judgment was obtained in regular course of law, and, that the debt must have been due when the deed in question was given. In this case, it is admitted that William Marshall was embarrassed long before 1858: one judgment was obtained in 1853, and though the other was not obtained until December, 1858, the large amount of damages or interest ($60 88) compared with the debt (88 38) shows that the debt had been due many years before.

So the judge there said that it was urged that Sands might have had property abundantly sufficient to satisfy his creditors, independently of the lands in question. But that, he. said, was not proved, and it was for the appellant to make out the fact; and he not having done so, the inevitable conclusion was that Sands had no other property out of which his creditors could obtain satisfaction. He then remarked on the conduct of the appellant, as not such as that of a *bona fide* purchaser would have been : and said that his answer as to the time when the deed was made and the first knowledge he had of it, was open to severe remark: and added: "it is pretended that he acted as an agent to the appellant, but no authority for that purpose is produced, and like the rest of the facts, it stands on the naked assertion of the appellant."

It is urged upon us that the utter want of caution of these parties repels any presumption of fraudulent conduct or intent. In this connection we are referred to their mistake as to the price to be paid William Marshall by his son, for his labor in 1858, and to their uncertainty as to the date of the purchase of the land 80 feet square. To us the former seems quite inconsistent with the hypothesis that the agreement was made in earnest and to be really acted under; and the latter with the alleged fact that the son received a transfer of all his father's right to the land on the 2d of May, 1858. That the assignment on the bond *might* have been antedated, and that its not being so is evidence of fair dealing, has been duly weighed by us, but amounts to very little when coupled with the facts that it is evidently the work of

one familiar with the law, and that Marshall "had had it very carefully drawn, because he had Green to fight." If he had ventured on antedating it, the handwriting might perhaps have disclosed by whom it was written, and the testimony of that person might have shown when it really was executed.

SPENCER, J. said in *Sands vs. Hildreth,* "I cannot take the trouble to go through all the evidence of fraud, nor shall I cite a single adjudged case; but content myself with saying that I never met with a more marked case of actual, positive fraud; and if such a deed, so contaminated, is allowed to stand, there would be an end of all upright and honest dealing between man and man, and no creditor would hereafter have the least chance of coercing a dishonest debtor to pay his debts." Whether we should or should not be justified in using language so strong and pointed in this case, we are at least prepared to say with the chancellor, that we are satisfied from the facts which have been stated that the transfer [to [the defendant was colorable merely, and intended to cover the property from claims then existing, or then impending and anticipated; and that, as against all such claims, the deed is to be adjudged fraudulent and void.

The court belowed decreed that the injunction granted on the original bill should be dissolved and the creditor remitted to all his remedies at law to make the property liable for the debts in question, and awarded damages at six per cent on the dissolution of the injunction, and the deed of Renfro was decreed to be "in all things set aside," so far as concerned the collection of the judgments in question; and that deed was "for the purpose of collecting said judgment debts, in all things canceled, set aside and held for naught"; with decree for all costs against the defendants.

In regard to the damages, were are of opinion that the case was not one for awarding them. By the statute, damages are to be assessed and awarded, only "when money has been injoined," and then "on the amount released by the dissolution of the injunction." This was not a suit to injoin the collection of a debt

generally, but only to prevent the sale of a particular property for payment of it. The existence of the debt and the validity of the judgments were in no wise impeached. The judgment debtor was not complainant, nor was the injunction granted to him. The collection of the debt out of other property, if his, was not injoined: and it might well happen that a third person could well ask for and obtain an injunction like the present, to prevent the sale of land claimed by him, without the judgment debtor having any connection with the question involved. Damages can only be assessed when the judgment debtor obtains an injunction to prevent the collection of a money demand. So much of the decree, therefore, is erroneous.

In *The State vs. Curran*, 15 *Ark.*, 20, the proper form of decree in a case like the present is given. The court below should have held the transfer of the title bond to James A. Marshall, and the deed to him, fraudulent and void as against these debts, and therefore should have decreed that unless by a day fixed, the defendants or one of them should pay the complainant the whole amount of debt, damages, interest and costs, adjudged by the said two judgments and of subsequent costs thereunder, and should also pay all the costs in the original suit and in the suit on cross-bill, in the court below, that then the lands specified in the pleadings, or so much thereof as should be necessary should be sold on that day, at the court house door in the county of Hempstead, by a commissioner appointed by the court for that purpose, and after a specified notice; that the commissioner should execute and deliver a deed or deeds to the purchaser or purchasers, conveying to him or them all the right and estate of both the defendants in said land, or so much thereof as might be sold, on the seventh day of March, 1859, or at any time since; that should the proceeds of such sale fail to produce satisfaction of said judgments and payment of costs, then that complainants should be remitted for the residue unsatisfied by said judgment to his legal remedy by execution or garnishment; and that the commissioner should first pay out of the moneys relized by such

sale the costs in the original and cross-suits, in the court below and the expenses of executing the decree, and then apply the residue to the satisfaction of said judgments, bringing the surplus, if any, into court.

The decree below will, therefore, be reversed, and decree entered here in conformity to this opinion, the court below to appoint the commissioner and fix the day of sale, and as the decree must have been reversed on appeal, as to the damages assessed, if otherwise properly framed, the costs in this court are to be paid by William D. Green, executor of George W. Green, the appellee.